## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: **04-CV-10605-EFH**

| | |
|---|---|
| BERNADINE T. GRIFFITH<br>Plaintiff )<br>)<br>)<br>vs. )<br>)<br>ONEBEACON INSURANCE COMPANY, )<br>and ONEBEACON AMERICA )<br>INSURANCE COMPANY )<br>Defendants )<br>) | **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

## AMENDED COMPLAINT

The Plaintiff, Bernadine T. Griffith, herein amends her Complaint once as a matter of course, having received no responsive pleading in this case, in accordance with Federal Rules of Civil Procedure 15 (a). The Complainant now avers as her complaint against Defendants: OneBeacon America Insurance Company, formerly Commercial Union Insurance Company; and OneBeacon Insurance Company, formerly CGU Insurance Company, the following:

## JURISDICTION

1.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and supplement jurisdiction under 28 U.S.C. § 1367. This suit is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1); and Section 107(a) of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C.A. § 12117(a), which incorporates by reference §§ 706 (f) (1) and (3) of Title

VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1) and (3), pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a.

## VENUE

2.    The discriminatory employment practices alleged herein to be unlawful were committed in Foxborough, Massachusetts and consequently venue in this judicial district is proper pursuant to 28 U.S.C.A. § 1391.

## NATURE OF THE ACTION

3.    This is an action against the Defendants under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1)(2); and Title I, Section 503 of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq. for its unlawful discriminatory employment practices on the basis of **race, retaliation, and disability**. The Defendants have intentionally and maliciously subjected the Plaintiff to a hostile work environment and retaliated against the Plaintiff, in part, because she filed and zealously prosecuted an April 29, 1997 charge of discrimination against her employer on the basis of her race, sex, retaliation, and disability, a charge that was ultimately remanded for additional investigation in the Massachusetts Commission Against Discrimination on December 6, 1999. Defendants created a hostile work environment and subjected Plaintiff to retaliation, all unlawful discriminatory conduct which included: the Defendants breached its company promise to grant sick leave of absence; revoked Plaintiff's authorized accommodation; refused to allow Plaintiff's requested accommodation to work at home two days a week, a similar accommodation accorded another white female co-worker on

maternity leave; failed to administer fringe benefits to the Plaintiff; imposed medically restrictive job assignments on the Plaintiff; denied Plaintiff access to software manuals and books pertaining to her job; segregated Plaintiff from a company break room; excluded the Plaintiff from attending informal group meetings; failed to provide Plaintiff with training and admission to programs accorded other group employees; all in violation of Plaintiff's federally protected rights under the ADA and Title VII.

## THE PARTIES

4.    The Plaintiff, Bernadine T. Griffith, is a citizen of the United States and a resident of Boxford, Essex County, Massachusetts. The Plaintiff, a black, disabled female, was 52-years old when she filed this first charge of discrimination in the Equal Employment Opportunity Commission.

5.    The Defendants: OneBeacon Insurance Company, formerly CGU Insurance Company (hereinafter "CGU"), and OneBeacon America Insurance Company, formerly Commercial Union Insurance Company (hereinafter "CU") are, jointly and severally, engaged in the insurance industry and are licensed in the Commonwealth of Massachusetts. On or about October 17, 2001, Commercial Union Insurance Company changed its name to OneBeacon America Insurance Company. On August 28, 2001, CGU Insurance Company changed its name to OneBeacon Insurance Company. OneBeacon America Insurance Company is a domestic corporation incorporated in the Commonwealth of Massachusetts and its principle place of business is One Beacon Street, Boston, MA 02108. OneBeacon Insurance Company is a foreign corporation incorporated in the Commonwealth of Pennsylvania and its principle place of business is

3

433 Walnut Street, Philadelphia, Pennsylvania. At all times relevant hereto each Defendant has done business in the Commonwealth of Massachusetts at the Foxborough facility location complained of herein, and has continuously had and/or did have at least twenty (20) employees.

6.    At all relevant times, Defendants have continuously engaged in the insurance industry, affecting commerce within the meaning of Section 101(5) of the ADA, 42 U.S.C.A. § 12111(5), Section 107(7) of the ADA, 42 U.S.C.A. § 12117(a), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C.A. § 2000e (g) and (h).

7.    Defendants are each an employer within the meaning of the ADA and Title VII.

## PROCEDURAL REQUIREMENTS

8.    On April 27, 1997, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") in Boston, Massachusetts. The charge was filed within three hundred (300) days after the occurrence of one or more of the unlawful employment practices alleged herein.

9.    On March 16, 2004, the EEOC issued the Plaintiff a Notice of Right to Sue letter, stating that Plaintiff could file an action under the ADA and Title VII. Plaintiff filed the complaint in this case within ninety (90) days after the date on which she received the Notice of Right to Sue.

10.   Consequently, all jurisdictional prerequisites to the institution of this lawsuit have been fulfilled, and Plaintiff has exhausted her administrative remedies as required by law.

4

## STATEMENT OF FACTS

11. On August 27, 1979, CU hired the Plaintiff, Ms. Griffith, a black female, age 35, as a computer operator.

12. For 22 years, Ms. Griffith satisfactorily performed the essential functions of her job. CU and CGU consistently rated her overall performance level as proficient.

13. In or around April of 1994, Ms. Griffith suffered a heart attack.

14. After recovering from quadruple-bypass heart surgery and upon returning to work in September of 1994, CU allowed her to take a reasonable accommodation.

15. CU's authorized reasonable accommodation permitted Ms. Griffith to modify her work schedule, to take her necessary medication at work, and to park in handicap parking.

16. CU recognized Ms. Griffith as a satisfactory employee by regularly generating satisfactory annual reviews and, in fact, promoted Ms. Griffith to the position of Senior Programmer Analyst on February 14, 1995.

17. On August 13, 1996, Ms. Griffith asked her new manager, Edmund Freeman, not to assign her tasks that had the potential to run past 5:45 PM because she had medication, exercise, and diet schedules that she had to adhere to at home every evening. She asked to work at home on Mondays and Fridays, as another programmer, Lori LeClerc, had when she had a baby.

18. In response to this request, Mr. Freeman became verbally abusive and he forced Ms. Griffith to disclose personal information about her health by threatening to fire her.

19. Mr. Freeman denied her request for a reasonable accommodation and he demanded that she work overtime. He informed her that he did not want her to be a part of the FormLink project.

20. On or about August 20, 1996, Ms. Griffith's attorney sent CU a letter requesting a reasonable accommodation. Counsel attached supporting medical documents to substantiate the finding of a heart disability.

21. On October 25, 1996, CU released a memo directing Mr. Freeman not to raise his voice, not to make any threatening comments to Ms. Griffith, to let Ms. Griffith work only from 9:30 to 5:45 PM, and not to work any overtime.

22. On October 30, 1996, Mr. Freeman stood by Ms. Griffith's cubicle and said "[d]o you know what a tar baby is"? Bob Petrarca, a co-employee stopped and asked "what"? While standing next to Ms. Griffith, Mr. Freeman repeated "[d]o you know what a tar baby is"? Mr. Petrarca responded, "yes, if you touch it, it sticks to you."

23. As a consequence of the "tar baby" remark, Ms. Griffith became very upset and distraught, finding the racial slur to be a hateful and hurtful comment. Ms. Griffith filed an internal complaint with Human Resources.

24. CU took no remedial steps to eradicate racial discrimination in the work force and continued to permit Mr. Freeman to work next to Ms. Griffith, thus inviting a continuous racial hostile environment to permeate on the floor.

25. Ms. Griffith sustained an inordinate amount of stress and feared for her safety at work, which exacerbated her heart condition.

26. In or around November 7, 1996, Barbara Medeiros replaced Mr. Freeman as Ms. Griffith's supervisor.

27. Thereafter, Ms. Medeiros and fellow co-employees in the group publicly humiliated Ms. Griffith by hurling insulting jokes and omitting her from informal meetings.

28. In 1996, Ms. Griffith complained to the company nurse, Lenore Woodley, that CU continued to fail to accommodate her disability; i.e., CU rejected Ms. Griffith's request to work out of her home two days a week and in the office three days a week.

29. In or around January 1997, when Ms. Griffith was allowed to arrive at work by 9:30 AM, Steve Tompkins and Lori LeClerc often greeted Ms. Griffith with "good morning Bernadine. Nice of you to join us." Ms. LeClerc had told her to "shut up, sit down, and get to work." Steve Tompkins called her "Miss In By Twelve."

30. Ms. Medeiros did not invite Ms. Griffith to the informal group meetings with Bob Petrarcas, Steve Tompkins, Lori LeClerc, and Rick Cantin, which often lasted up to thirty minutes at a time.

31. In or around February of 1997, Ms. Medeiros stopped scheduling staff meetings altogether, which effectively kept Ms. Griffith completely out of the group.

32. On or about April 15, 1997, the group returned from a long break and Bob Petrarca said that they needed a full-time QA person to test applications and Steve Tompkins said that Ms. Griffith could do it. Bob Petrarca laughed and said that was a "real bad shot at her."

33. On April 17, 1997, the group went on a break and Steve Tompkins said to Ms. Griffith in front of everyone "we don't want you to come anyway."

34. The group returned about thirty minutes later and Bob Petrarca said to Ms. Griffith with a smile on his face: "I hear your project is going slowly."

35. Other programmers in the group developed skills in writing image systems at CU while Ms. Griffith did not. Ms. Griffith was given clerical duties that consumed a lot of her regular hours.

36.  Ms. Griffith, who was responsible for debugging software, did not have access to books and software manuals that explained how the code worked, while other employees were given individual books and software manuals on the code.

37.  Ms. Griffith was regularly required to learn an application from an end user, and the employer would not issue her a copy of the software manual.

38.  When Ms. Griffith reported that one employee changed her files on a project she was working on, management retaliated by threatening to place Ms. Griffith on probation. This adverse employment condition caused Ms. Griffith to suffer stress, chest pains, and she feared for her job security.

39.  On April 27, 1997, Ms. Griffith filed a charge of discrimination in the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on the basis of race, sex, age and retaliation.

40.  On May 7th and 23rd of 1997, Ms. Griffith sought medical attention for chest pains and work-related stress. Her physician ordered her to stay at home to limit work-related stress.

41.  On July 1, 1997, Ms. Griffith, through her lawyers, asked her Employer to allow her to work two days at home and three days in the office.

42.  This request for an accommodation was ignored, and Ms. Griffith worked the next two Saturdays to complete a project.

43.  On July 9, 1997, Ms. Griffith over heard Ms. Medeiros say about her: she "asked to work at home, but she has a project to do . . . I'm really mad that Bernadine asked for an accommodation."

44.   In response to Ms. Griffith's April 27, 1997 charge of discrimination filed in the MCAD and EEOC, CU stated that Mr. "Freeman admits making a remark about a 'tar baby' to another employee."

45.   CU attempted to explain away this racial slur by noting that Mr. Freeman "was removed from his management."

46.   CU further asserted in its June 25, 1997 Position Statement that "[a] pproximately 400 individuals work in the CU division in which Ms. Griffith is employed. These individuals are located in two floors of a large four-story office building. At the times of the recent incidents of which Ms. Griffith complains, Freeman's work area was some distance away, perhaps 30 feet from hers. No visual contact is possible between the work areas unless both individuals are standing. No verbal contact is practical from this distance in a busy office. Mr. Freeman's work area was not changed at the time of his reassignment because his duties did not require it. Because of their strained relationship, he has made a point of avoiding contact with Ms. Griffith when possible."

47.   At this point in time, however, Mr. Freeman made hateful looks at Ms. Griffith and he posted a NRA sticker in his office area. On one occasion, Mr. Freeman almost struck Ms. Griffith when he intentionally threw his fist at her.

48.   In or about 1996 to 1997, there were only two other black employees and both black employees were female.

49.   By 1997, it was well established that Ms. Griffith's medical condition had substantially impaired her ability to work; she was required to adhere to a rigid schedule of medication, one that made her ill in the early mornings. Thus, necessitating the need to arrive at work at 9:30 AM and to leave work at 5:45 PM.

50. Ms. Griffith had asserted that she was a handicapped individual with a history of coronary artery disease, hypertension, and hyperlipidemia, since May of 1994.

51. In short, Ms. Griffith's medical condition required her to take short periods of rest at work, to not work overtime, and to receive medical treatment for periodic chest pains caused by the said hostile work environment.

52. Ms. Griffith's request for an accommodation to work at home two days a week and three days in the office was reasonable and posed no undue hardship on her employer because software and hardware could have been made available at home, like her employer did for another employee in her group, Lori LeClerc, who took a maternity leave.

53. Ms. Griffith's need to care for herself in the evenings included the tasks of taking additional medication, adhering to a certain diet, and regularly exercising at home.

54. Often, Ms. Griffith brought her work-related stress home, which affected the enjoyment of her family and husband. She was not able to rest in the evenings. She found herself anxious, nervous, exhausted, and fearful. She stopped exercising at night.

55. In or about 1997 to 1998, Ms. Griffith often worked late, 3 to 4 times a week, to meet a deadline; and, her husband often worried about her driving home alone late at night, on the days when she made up time.

56. In the 22-year history of her employment, neither CU nor CGU would allow Ms. Griffith to work at home.

57. On July 16, 1999, the MCAD initially made a determination to dismiss the first charge of said discrimination.

58. On December 6, 1999 the Commission remanded the charge for additional investigation having found probable cause.

## COUNT ONE – ADA, TITLE I
### (against all defendants)

59    Paragraphs 1 through 58 of this complaint are incorporated herein by reference as if fully pleaded in this First Count.

60    Plaintiff suffers from a physical impairment, which substantially limits her in the major life activity of working.  Therefore, Plaintiff is a qualified disabled individual within the meaning of the ADA.

61    At all relevant times, Plaintiff was able to perform and performed satisfactorily the essential functions of her job with or without a reasonable accommodation.

62    Plaintiff requested a reasonable accommodation, orally and in writing, and Plaintiff submitted supporting medical documentation.

63    The Defendants failed to accommodate the Plaintiff's disability.

64    The Defendants intentionally and maliciously breached its promise to accord her a reasonable accommodation; revoked Plaintiff's authorized medical leave; refused to accommodate Plaintiff's disability; refused to allow the Plaintiff's requested accommodation to work at home two days a week, a similar accommodation accorded another white female co-worker on maternity leave; and imposed medically restrictive job assignments on the Plaintiff that were not part of her job description.

65    The acts alleged above constitute unlawful employment discriminatory practices in violation of ADA Section 102(a) and 102(b)(1), 42 U.S.C.A. §§ 12112(a), 12112(b)(1). All conduct alleged above occurred during a legally cognizable time period at Defendants' Foxborough Massachusetts facility.

66      Defendants' intentional employment practices, as alleged above, deprived Plaintiff of equal employment opportunities and otherwise adversely affected her status as an employee, and were the result of Plaintiff's disability.

67      Defendants engaged in the above-described unlawful discriminatory conduct against Plaintiff with malice and/or a reckless disregard of Plaintiff's federally protected rights.

.

        WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.


## COUNT TWO – RETALIATION UNDER ADA
### (against all defendants)

68      Paragraphs 1 through 67 of this complaint are incorporated herein by reference as if fully pleaded in this Second Count.

69      Defendants have violated Section 503 of the ADA, 42 U.S.C. § 12203, when Defendants intentionally and/or with a reckless disregard committed the above-stated unlawful discriminatory acts, as a result of Plaintiff's exercising rights and privileges protected by the ADA.

70    Defendants creating a hostile work environment of Plaintiff's employment on the basis of her disability has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of enjoyment life, and other non-pecuniary losses.

71    By their actions set forth above, Defendants have, jointly and severally, engaged in unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and have interfered with Plaintiff's exercise of her protected rights, in violation of ADA, 42 U.S.C. § 12117(a).

72    Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to punitive damages under ADA.

WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT THREE – TITLE VII
### (against all defendants)

73    Paragraphs 1 through 72 of this complaint are incorporated herein by reference as if fully pleaded in this Third Count.

74    The Plaintiff, a black female, is a member of a protected class.

75    The Defendants knew she was a member of a protected class.

76    The Defendants intentionally treated the Plaintiff differently from similarly situated co-workers who were not members of the protected class: Defendants subjected her to an un-welcomed racial hostile work environment when they failed to properly investigate her complaints of racial discrimination; barred her from attending informal group meetings; denied her computer training and admission to programs accorded other white group employees; assigned her clerical tasking; did not give her access to manuals and books that other white co-employees enjoyed the use of; continued to employ and allow her supervisor to sit near her after this supervisor admitted to making a profoundly hurtful severe racial slur, calling Plaintiff a "tar baby"; refused to accommodate Plaintiff's disability by allowing her to work from home, a similar accommodation accorded another white female co-worker; revoked Plaintiff's medical leave; and imposed medically restrictive job assignments on the Plaintiff that were not part of her job description.

77    The intentional treatment of the Plaintiff differently from similarly situated co-workers who were not members of the protected class resulted in causing the Plaintiff to suffer adverse employment consequences.

78    The Defendants' discriminatory practices against the Plaintiff on the basis of her race are prohibited by federal law under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1).

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT FOUR – RETALIATION UNDER TITLE VII
(against all defendants)

79    Paragraphs 1 through 78 of this complaint are incorporated herein by reference as if fully pleaded in this Fourth Count.

80    Defendants have violated Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, when Defendants intentionally and/or with a reckless disregard committed the above-stated acts, to include: excluded Plaintiff from a company break room, training, programs, and informal scheduled meetings; denied her access to software manuals and books pertaining to her job and created a hostile work environment, as a result of Plaintiff's exercising rights and privileges protected by Title VII.

81    Defendants creating a hostile work environment on the basis of her race has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for future

pecuniary losses, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

82      By their actions set forth above, Defendants have, jointly and severally, engaged in unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and have interfered with Plaintiff's exercise of her protected rights, in violation of Title VII, 42 U.S.C.A. § 2000e.

83      Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to punitive damages under Title VII.

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all the issues raised by the Complaint.

Respectfully submitted,
BERNADINE T. GRIFFITH
By her Attorney,

Date: 7/21/04

Kathleen J. Hill        BBO# 644665
LAW OFFICE OF KATHLEEN J. HILL
92 State Street, Suite 700
Boston, MA 02109
617.742.0457 (O) / 617.742.4508 (F)

## CERTIFICATE OF SERVICE

I, Kathleen J. Hill, herein certify that I served a true and accurate copy of the foregoing Plaintiff's Amended on the counsel of record: Leah M. Moore, of Morgan, Brown & Joy, One Boston Place, Boston, Massachusetts by pre-paid U.S. Mail and facsimile on this 21st day of July 2004.

Kathleen J. Hill

17